United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LOMELI GOMEZ ROBLES,

Petitioner,

v.

CHRISTOPHER PIERCE,

Respondent.

Case No. 23-cv-04405-JST

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

Petitioner, a California state prisoner currently housed at Ironwood State Prison,[1] has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the validity of his state court conviction. ECF No. 1. For the reasons set forth below, the petition is DENIED.

## I. PROCEDURAL HISTORY

On December 17, 2018, a Santa Clara County jury found Petitioner guilty of seven counts of forcible lewd act on a child under the age of 14 (Cal. Penal Code § 288(b)(1)); two counts of oral copulation or sexual penetration of a child under the age of 10 (Cal. Penal Code § 288.7(b)); two counts of sexual intercourse or sodomy with a child under the age of 10 (Cal. Penal Code § 288.7(a)); three counts of aggravated sexual assault on a child under the age of 14 (Cal. Penal Code § 269(a)); and two counts of a lewd act on a child 14 or 15 years old (Cal. Penal Code § 288(c)(1)). Exh. 1 ("CT") at 759-774, 776; Exh. 3 ("RT") at 4803, 4816-4618, 4823. On April 24, 2019, the trial court sentenced Petitioner to an indeterminate term of 125 years to life, plus 59 years and 8 months, consisting of two consecutive terms of 25 years to life for two counts of

---

[1] In accordance with Habeas Rule 2(a) and Rule 25(d)(1) of the Federal Rules of Civil Procedure, the Clerk of the Court is directed to substitute Warden Christopher Pierce as respondent because he is Petitioner's current custodian.

sexual intercourse or sodomy with a child under age 10 (Cal. Penal Code § 288.7(a)), two consecutive terms of 15 years to life for two counts of oral copulation/sexual penetration with a child under age 10 (Cal. Penal Code § 288.7(b)), three consecutive terms of 15 years to life for three counts of aggravated sexual assault on a child under age 14 (Cal. Penal Code § 269(a)), seven consecutive terms of eight years for the forcible lewd act convictions (Cal. Penal Code § 288(b)), one consecutive three year term for one lewd act conviction on a child age 14-15 (Cal. Penal Code § 288(c)(1)), and a consecutive term for a separate lewd act conviction (Cal. Penal Code § 288(c)(1)). ECF No. 1-3 at 9-10; CT 817-826; RT 5417-5422.

On January 31, 2022, the California Court of Appeal affirmed the judgment. *People v. Robles*, C No. D079453, 2022 WL 278655, at *1-*4 (Cal. Ct. App. Jan. 31, 2022). On April 20, 2022, the California Supreme Court denied review. Answer, Ex. 10 [ECF No. 17-30 at 2].

Petitioner filed the instant petition on May 25, 2023. ECF No. 1. The Court screened the petition and found that it stated the following cognizable claims: (1) the state court erred in admitting the victim's police interview in its entirety; (2) the state court erred in admitting the expert testimony on Child Sexual Abuse Accommodation Syndrome; (3) the state court erred in admitting Doe's grandmother Maria Medina's conditional examination transcript; (4) the state court erred in admitting pictures of the victim at different ages; and (5) cumulative error. *See generally* ECF No. 9. The Court ordered Respondent to show cause why federal habeas relief should not be granted. *Id.* On September 4, 2024, the Court granted in part and denied in part Respondent's motion to dismiss; dismissed Claim Nos. 1 and 4 for lack of federal habeas jurisdiction; dismissed Claim No. 3 as unexhausted; and ordered Respondent to show cause why federal habeas relief should not be granted with respect to Claim No. 2. ECF No. 14.

Respondent has filed an answer to the petition. ECF Nos. 15-17 ("Answer"). Petitioner has not filed a traverse, and the deadline to do so has passed.

/ / /

/ / /

/ / /

/ / /

2

## II.  FACTUAL BACKGROUND

The following factual and procedural background is taken from the California Court of Appeal's opinion:[2]

### FACTUAL AND PROCEDURAL BACKGROUND

*Background*

Doe was born in December 1998 and turned 20 years old during Robles's trial. Robles, who was 26 years older than Doe, began a relationship with Doe's mother (Mother) when Doe was about two years old. Doe's half-sister (Sister) was born in 2003 and is the child of Mother and Robles.

*Doe*

Robles began molesting Doe when she was seven years old. Doe then was living with Robles, Mother, and Sister in an apartment on Rancho Drive in San Jose, California. Robles molested Doe more than 10 times when she was seven by rubbing her vagina skin-to-skin; digitally penetrating her vagina; and touching her chest. Robles would tell Doe to be "quiet" when molesting her, and at times would physically restrain her when she attempted to stop him or get away.

Doe was scared, confused, and felt "stuck" when Robles sexually abused her. Many times during the abuse Robles would "nervously laugh[ ]" while reassuring Doe everything was going to be "okay" and not to "worry." The abuse typically occurred when Mother was working at night. After abusing Doe, Robles would act "normal" around the home as if nothing had happened.

The molestation of Doe continued when she was eight and nine years old. The family was still living on Rancho Drive. During this time frame, Doe estimated Robles touched her vagina skin-to-skin more than 15 times; digitally penetrated her vagina; and rubbed her chest. On occasion, Doe experienced a "burning" sensation in her vagina due to Robles touching her.

When Doe was eight years old, a social worker interviewed her at school after Doe disclosed to a teacher that Robles had hit Mother. Doe denied Robles hit or touched her inappropriately, telling the jury she did not then disclose the sexual abuse by Robles because she was afraid of him.

When Doe was about 10 years old, the family moved into a one-bedroom apartment at the Thornbridge Apartments in San Jose. While aged 10, Doe estimated Robles touched her vagina skin-to-skin and

---

[2] The Court has independently reviewed the record as required by AEDPA. *Nasby v. Daniel*, 853 F.3d 1049, 1052–54 (9th Cir. 2017). Based on the Court's independent review, the Court finds that it can reasonably conclude that the state court's summary of the prosecution case and the defense case is supported by the record, unless otherwise indicated in this order.

United States District Court
Northern District of California

digitally penetrated her vagina more than 20 times; "lick[ed]" and "suck[ed]" her vagina more than 15 times; fondled, and put his mouth on her breasts at least five times; and penetrated her vagina with his penis about 10 times, which, because of her age, would only go inside her "just slightly." After some incidents of abuse, Doe would go into the bathroom and "stare" in the mirror, telling herself she was "disgusting."

On one occasion when she was 10, Robles molested Doe while she slept on the living room floor next to her maternal grandmother, Maria (Grandmother), who was visiting from Mexico. Doe and Grandmother were "very close." As Grandmother slept, Robles kissed Doe on the lips while she sat on the couch. Doe pushed him away and immediately went and laid next to Grandmother.

Robles followed Doe, using her blanket to partially cover himself while the two laid on the floor near Grandmother. He began rubbing Doe's "side area" with his hand. Panicked, Doe nudged Grandmother, hoping she would awaken. Doe next crossed her legs, put her hands over her chest, and made eye contact with Robles. He smiled and turned over. Doe fell asleep. However, during the night she was awakened by Robles touching her vagina over her pajamas. As Doe resisted, she saw Grandmother move. Robles stopped and turned onto his side.

The next morning, Doe witnessed a confrontation between Grandmother, Robles, and Mother, after Grandmother accused Robles of inappropriately touching Doe. Robles told Grandmother she was "crazy," called her a "liar" for making this accusation, and demanded she immediately leave the family home and never return. Grandmother complied.

Between the ages 11 and 13, Doe estimated Robles digitally penetrated her vagina more than 50 times; licked her vagina more than 20 times; touched her breasts; and penetrated her vagina with his penis between five to 10 times. She recalled one incident during this time period when Robles burst into the bathroom when she was naked and about to shower, lifted her onto the sink, and digitally penetrated her vagina.

She recalled another incident during this same period when he touched her vagina skin-to-skin after she got home from a friend's birthday party at Chuck E. Cheese. In another incident, Robles digitally penetrated her vagina, then licked her vagina, after she had come home from school. Doe recalled this specific incident because as she and her friends were walking home from school, one of them saw Robles hiding in some "bushes," watching Doe.

Doe and her family moved out of the Thornbridge apartment when she was 13 years old, after she graduated from the eighth grade. Robles continued to sexually abuse Doe, and told Doe he would harm her and Mother if Doe disclosed the abuse. He also told Doe if she disclosed, he would claim she had initiated the sexual contact.

When she was 13, Doe and Sister started visiting Robles at his parents' home in the city of Santa Nella, California, where Robles had

moved after he and Mother separated. Robles continued to sexually abuse Doe during overnight visits at Santa Nella, including when Sister was in the bedroom asleep.

When Doe was 14 and 15 years old, she estimated Robles penetrated her vagina with his penis more than 30 times; put his mouth on her breasts 15 to 20 times; and digitally penetrated and licked her vagina more than 20 times. The sexual abuse occurred when Doe and Sister would spend the weekend at the Santa Nella home. Doe did not want to go on these overnights, but accompanied Sister—who missed her father and was then unaware of the sexual abuse of Doe—to ensure her safety. Doe recalled an incident at Santa Nella when she was about to shower. Robles entered the bathroom and began touching her "all over." During the incident, Doe saw Robles's cellphone hidden in a bathroom "vent." Doe became angry and confronted Robles after she saw naked images of herself on his cellphone.

Between the ages of 15 and 17, Robles molested Doe less frequently. Doe sometimes would go to Santa Nella without Sister. She went because Robles told her he was "lonely" and because he threatened to hit her and kill Mother if she did not go.

On January 3, 2016, 17-year-old Doe and Sister went to the Santa Nella home for the weekend. During the night while Sister ostensibly was asleep, Robles began molesting Doe, who resisted. Laughing, Robles then told Doe he had naked photographs and videos of her, and threatened her, saying, "'You're going to pay for this.'" Not wanting to awaken Sister, Doe "silently cr[ied]."

The following day, Robles drove the two girls back to their mother's home in San Jose. Once home, Doe went into Mother's bedroom, panicked, and for the first time disclosed Robles's sexual abuse. Sister also disclosed she had overheard Robles say, "'You're going to pay for it'" and "'Giselle, I have nude photos and videos of you.'" Mother was in "shock" and cried after her daughters' disclosures.

*Grandmother*

As discussed *post*, Grandmother was deemed unavailable at trial, and portions of her conditional statement were read to the jury. Grandmother testified that during a visit with Doe's family in 2010 or 2011, while she was sleeping on the living room floor with both granddaughters, she was awakened by Robles and saw him grab Doe's breast. Although pretending to be asleep, Grandmother heard Doe tell Robles, "I'm going to tell my mom," and Robles make a "shushing sound" for Doe to keep quiet. Robles then left the room.

Grandmother estimated Robles returned about 30 minutes later. In the meantime, Grandmother had changed positions with Doe to protect her from Robles. Over her clothes, Robles grabbed Grandmother's vagina and buttocks. Grandmother responded by slapping his face and telling him he had "made a mistake."

The following day, Grandmother confronted Robles about his inappropriate touching of Doe (and her). Robles responded, "What I'm raising is for me." Grandmother told Mother that Robles "touches

[Doe] too much" and it needed to stop. Grandmother, however, did not report Robles to the police because she was afraid of him and he said nobody would believe her. At Robles's request, Grandmother left the family home that morning.

*Investigation*

Mother took her daughters to the police station on January 4, 2016, the same day Doe first disclosed the sexual abuse by Robles. The two girls separately prepared handwritten statements for police: Doe, describing the sexual abuse by Robles, and Sister, describing Robles's statements to Sister from the night before.

Officer Jose Rodriguez of the San Jose Police Department interviewed Doe on January 12, 2016. As discussed *post*, a minimally redacted version of the video recording was played for the jury.

On February 1, 2016, at the request of police Doe made a pretext phone call to Robles, which was recorded and also played for the jury. [FN 1] During the call Doe told Robles she was having nightmares and needed his help. Robles responded he wanted to talk to Doe, but not over the phone because "maybe they are monitoring ... and listening to me." He repeatedly denied "raping" her, admitted he was "scared about all of this," but if they talked in person he could "clarify" things for her.

FN 1: The transcript of the phone call is in the appellate record.

A few days later, Robles text-messaged Doe, asking if could contact her. The next day he sent another message asking if they could meet in person so he could "'explain everything,'" and requesting she not tell Mother about his messages.

*Trial Court Proceedings*

In November 2017, the Santa Clara County District Attorney filed an amended information charging Robles with seven counts of forcible lewd acts on a child under the age of 14 (Pen. Code, § 288, subd. (b)(1); [FN 2] counts 1-7); two counts of oral copulation or sexual penetration of a child under the age of 10 (§ 288.7, subd. (b); counts 8 & 9); two counts of sexual intercourse or sodomy with a child under the age of 10 (*id.*, subd. (a); counts 10 & 11); four counts of aggravated sexual assault on a child under the age of 14 (§ 269; counts 12-15); and two counts of committing a lewd act on a child 14 or 15 years old (§ 288, subd. (c)(1); counts 16 & 17).

FN 2: Unless otherwise indicated, all further statutory references are to the Penal Code.

The jury found Robles guilty as charged, except it deadlocked on count 15, aggravated sexual assault on a child under the age of 14. The trial court declared a mistrial on that charge and later dismissed it pursuant to the People's motion. In April 2019, the court sentenced Robles to an indeterminate term of 125 years to life, consecutive to a determinate term of 59 years and 8 months.

*People v. Robles*, C No. D079453, 2022 WL 278655, at *1-*4 (Cal. Ct. App. Jan. 31, 2022).

### III. DISCUSSION

#### A.    Standard of Review

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state courts' adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue "had substantial and injurious effect or influence in determining the jury's verdict."  *Penry v. Johnson*, 532 U.S. 782, 795 (2001).  A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  *Williams*, 529 U.S. at 405–06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

The state court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991);[3] *Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005). Petitioner raised this claim in his federal habeas action in the state court on direct appeal and in his petition for review. Answer, Exs. 5, 9 [Dkt. Nos. 17-25, 17-29]. The state appellate court denied the claim in a reasoned decision, *Robles*, 2022 WL 278655, and the state supreme court summarily denied the claim, Answer, Ex. 10. The Court therefore reviews the state appellate court's reasoned decision when considering Petitioner's claim on federal habeas review.

**B.    Petition**

Petitioner argues that the expert testimony on Child Sexual Abuse Accommodation Syndrome ("CSAAS") was prejudicial and not harmless beyond a reasonable doubt because its sole purpose was to lend weight to the victim's allegations; it necessarily made the victim's testimony more credible to the jury because it "came from a witness with impressive credentials and experience, who had neither a personal nor professional stake in the outcome, and who had testified regarding what he represented were the behaviors of abused children;" and because the case turned primarily on the credibility of victim's testimony. ECF No. 1-3 at 43-70.

---

[3] Although *Ylst* was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default. *Barker v. Fleming*, 423 F.3d 1085, 1091 n.3 (9th Cir. 2005). The look through rule continues as the Ninth Circuit held that "it is a common practice of the federal courts to examine the last reasoned state decision to determine whether a state-court decision is 'contrary to' or 'an unreasonable application of' clearly established federal law" and "it [is] unlikely that the Supreme Court intended to disrupt this practice without making its intention clear." *Cannedy v. Adams*, 706 F.3d 1148, 1158 (9th Cir.), *amended*, 733 F.3d 794 (9th Cir. 2013).

The state appellate court denied this claim as follows:

## II. CSAAS Evidence

Robles next contends the trial court prejudicially erred in admitting CSAAS evidence. We disagree.

*Additional Background*

During motions in limine, the People sought to admit expert testimony on CSAAS and requested the court use CALCRIM No. 1193. [FN 6] The prosecutor argued this evidence was relevant because Doe's disclosures were "piecemeal," "conflicted," and "delayed." The defense moved to exclude the CSAAS evidence, claiming it was not probative, was highly prejudicial, and was not deemed reliable by the relevant scientific community, as found by courts from other jurisdictions.

> FN 6: CALCRIM No. 1193 currently provides: "You have heard testimony from _____ <*insert name of expert*> regarding child sexual abuse accommodation syndrome. [¶] _____'s <*insert name of expert*> testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against (him/her) [or any conduct or crime[s] with which (he/she) was not charged]. [¶] You may consider this evidence only in deciding whether or not _____'s <*insert name of alleged victim of abuse*> conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of (his/her) testimony."

The trial court admitted the CSAAS testimony, recognizing that, while some states (i.e., New Jersey, as discussed *post*) have limited or excluded CSAAS evidence, "it is very much the State of California law that this testimony is still appropriate." Based on the offers of proof in this case, the court found there was "very clearly a delayed disclosure" and "arguably inconsistent disclosures" by Doe, and she feared reprisal if disclosure was made. The court ruled the CSAAS evidence would be admitted after Doe's testimony was complete.

The court, however, also ruled the People's expert would not be able to rely on statistics to show, for example, that "nine out of every ten reports" of sexual abuse are true, thereby supporting the veracity of Doe's testimony. The court also ruled it would admonish the jury regarding the use of CSAAS evidence, including "re-reading parts or all" of the instruction dealing with this evidence.

During trial, defense counsel renewed his objection to expert testimony on CSAAS, claiming for the first time this evidence was irrelevant because the jurors during voir dire had each agreed that "children respond differently to sexual assault because they're individuals, and that there's not one way they'll respond." Counsel thus argued there was no need for expert testimony on CSAAS because "there are no myths to dispel." In upholding its prior ruling, the court recalled the questions to the jurors during voir dire on this subject matter were in connection with whether they could be challenged for cause, which it found was for a different purpose than admitting the CSAAS evidence.

The People called licensed psychologist Blake Carmichael to testify on the characteristics of children who have been impacted by sexual abuse. After Dr. Carmichael was designated as an expert but before he testified on CSAAS, the court admonished the jury as follows (using CALJIC 10.64): [FN 7]

9

"So, members of the jury, evidence will be presented to you by Dr. Carmichael concerning [CSAAS]. This evidence is not received and must not be considered by you as proof that the alleged victim's claim is true. [CSAAS] research is based upon an approach that is completely different from that which you must take to this case.

"The syndrome research begins with the assumption that a molestation has occurred and seeks to describe and explain common reactions of children to that experience. As distinguished from that research approach, you are to presume the defendant innocent. [¶] The People have the burden of proving guilt beyond a reasonable doubt. [¶] You should consider the evidence concerning the syndrome and its effect only for the limited purpose of showing, if it does, that the alleged victim's reactions, as demonstrated by the evidence, are not inconsistent with her having been molested."

FN 7: The record shows the court preferred the CALJIC instruction on CSAAS over its CALCRIM counterpart.

Dr. Carmichael testified CSAAS was based on an article published in the early 1980's that identifies behaviors of sexually abused children, including to dispel "misconceptions and myths that people still hold about kids and, after they have been sexually abused, how they should act or might act." Dr. Carmichael conducted no investigations in this case, including interviewing witnesses or reading police reports and transcripts; he did not know the parties, the nature of the charge or charges against Robles, or anything about this case including its facts; and he was not testifying to indicate whether or not Doe had in fact been sexually abused. Instead, he told the jury his role was merely to "educate people ... about this population of kids and the field of psychology in general" as it related to child sex abuse.

Dr. Carmichael stated there are five recognized aspects of CSAAS: (1) secrecy; (2) helplessness; (3) entrapment or accommodation; (4) delayed, conflicting, and/or unconvincing disclosure; and (5) retraction or recanting. He noted there was no "checklist" or "tool" to use to determine when a child has been sexually abused, and therefore not all five components are necessarily present in a given situation.

Dr. Carmichael opined that most children are sexually abused by someone with whom they have a preexisting relationship. As a result, he noted some abused children are apprehensive to disclose the abuse, and may not do so for "long periods of time," because they are told by the abuser to keep it a secret; the abuser threatens them or their family members with potential harm if they disclose; or they worry about the consequences—including to their family—once disclosure is made. He also opined that the "majority of kids delay disclosures" of sexual abuse, and some may wait to do so until after they turn 18 years old.

In addition, if a child is repeatedly sexually abused over the course of months or years, Dr. Carmichael noted "some of those events kind of start blurring together and they get jumbled up," making it "very difficult" for the abused child to recount each instance of abuse. He explained that is why the "consistency of telling [of the abuse] will oftentimes be quite inconsistent." He also noted sometimes an abused child will engage in "'incremental disclosure,'" which is a "process" of disclosure and not "a one-time event"; and other times the child will deny being sexually abused even when asked directly, because the child is not yet "comfortable" talking about it.

10

*Guiding Principles*

The Supreme Court in *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*), held that expert testimony on "the common reactions of child molestation victims," known as CSAAS, "is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." "'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.'" (*Id.* at p. 1301; see also *People v. Munch* (2020) 52 Cal.App.5th 464, 472 (*Munch*) [noting "courts have long recognized the well-established relevance, necessity, reliability, and importance" of CSAAS evidence].)

As the trial court here admonished the jury, CSAAS evidence "is not admissible to prove that the complaining witness has in fact been sexually abused." (*McAlpin, supra*, 53 Cal.3d at p. 1300; see *People v. Bowker* (1988) 203 Cal.App.3d 385, 393.) Nor is an expert "allowed to give an opinion on whether a witness is telling the truth . . . ." (*People v. Long* (2005) 126 Cal.App.4th 865, 871.) We apply an abuse of discretion standard in reviewing the decision of a trial court to admit expert testimony. (*McAlpin*, at p. 1299.)

*Analysis*

We conclude the trial court did not abuse its discretion in admitting CSAAS evidence due to Doe's behavior in waiting almost 10 years to report the sexual abuse; her denial of being sexually abused when confronted by a social worker during a school interview; and her inconsistent description and omission of certain instances and details of abuse in statements she made during the recorded interview in January 2016, and at Robles's November 2016 preliminary hearing, when events ostensibly were "fresher" in her mind than her trial testimony years later. That the prosecutor in the instant case may not have expressly stated these particular behaviors, as evidence that was potentially inconsistent with a finding of abuse, is not determinative; "[i]t is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation." (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745 (*Patino*).) Clearly, that was the case here.

Moreover, the record shows the trial court handled the admission of CSAAS evidence carefully and correctly. Prior to Dr. Carmichael's testimony, the court admonished the jury that it was to consider CSAAS testimony only for the limited purpose of showing, if it all, Doe's responses as demonstrated by the evidence were not inconsistent with her having been sexually abused; and that it was the People's burden to prove Robles's guilt beyond a reasonable doubt. (See *Patino, supra*, 26 Cal.App.4th at p. 1744 [because CSAAS testimony is inadmissible to prove a molestation occurred, "[i]t can be highly prejudicial if not properly handled by the trial court"].)

Despite Supreme Court authority admitting CSAAS testimony, Robles cites decisions from out-of-state courts excluding or limiting CSAAS evidence. We, however, are bound by stare decisis to follow California law, including the *McAlpin* decision admitting CSAAS testimony. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [trial and appellate courts must follow binding Supreme Court authority].) Moreover, as courts have recently observed, "the vast majority of jurisdictions [outside California] have rendered decisions that are consistent with *McAlpin*." (See, e.g., *Munch, supra*, 52 Cal.App.5th at p. 472.)

11

United States District Court
Northern District of California

As he did in the trial court, Robles primarily relies on *State v. J.L.G.* (N.J. 2018) 190 A.3d 442 (*J.L.G.*), to support his claim of error on this issue. There, the New Jersey Supreme Court had remanded the matter for hearing to better assess the defendant's claim CSAAS evidence was inadmissible. In the remanded hearing, four experts testified, and the parties introduced numerous scientific studies. (*Id.* at p. 446.) The *J.L.G.* court held CSAAS expert testimony was no longer admissible except for the aspect of delayed disclosure, deeming such evidence unreliable from a scientific standpoint. (*Ibid.*)

Here, unlike the situation in *J.L.G.*, the CSAAS evidence was not being used as scientific proof to support a finding that Doe had in fact been sexually abused by Robles. To the contrary, Dr. Carmichael unambiguously testified that it was up to the jury to determine whether Doe had been sexually abused by Robles; and that his (i.e., Dr. Carmichael's) testimony was limited to educating jurors on certain misconceptions and myths regarding the behaviors of sexually abused children that may not be apparent to laypeople. (See *Munch, supra*, 52 Cal.App.5th at pp. 470-471 [rejecting a similar argument of the defendant based on *J.L.G.* and concluding "*J.L.G.* involves an aberrant view of CSAAS," was "'overly dismissive of the "accommodation" aspect of CSAAS,'" and relied on a journal article that was inconsistent with the general view held by child abuse experts, which article was subsequently challenged by those experts for poor statistical analysis].) [FN 8] We conclude *J.L.G.* does not guide our analysis on this issue.

> FN 8: Robles also relies on other cases from outside our jurisdiction to support his claim CSAAS evidence is inadmissible. One such case is *Franklin v. Henry* (9th Cir. 1997) 122 F.3d 1270. But that case arose in a different context and the court did not actually hold CSAAS evidence is never admissible. (*Id.* at p. 1273.) Although not cited by Robles, the Ninth Circuit more recently stated, "[W]e have held that CSAAS testimony is admissible in federal child-sexual-abuse trials, when the testimony concerns general characteristics of victims and is not used to opine that a specific child is telling the truth." (*Brodit v. Cambra* (9th Cir. 2003) 350 F.3d 985, 991; see also *Munch, supra*, 52 Cal.App.5th at p. 470 ["Ninth Circuit decisions are consistent with *McAlpin*."].) In any event, we do not follow these out-of-state decisions when they conflict with California law. (See *Munch*, at pp. 468-469 [following *McAlpin* and rejecting the defendant's reliance on out-of-state authorities that may disagree with it].)

Robles also argues CSAAS evidence should be excluded because myths and misconceptions about child sexual abuse victims are no longer prevalent, including among the jurors in this case based on their jury questionnaires. We disagree.

*McAlpin* recognized a "'jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard. Instead, [Evidence Code section 801, subdivision (a) [FN 9]] declares that even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would "assist" the jury. It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that [people] of ordinary education could reach a conclusion as intelligently as the witness."'" (*McAlpin, supra*, 53 Cal.3d at pp. 1299-1300.) Robles has not shown that Dr. Carmichael's testimony "'would add nothing at all'" to the jury's understanding of commonly held misconceptions about child sexual abuse. (*Id.* at p. 1300.)

> FN 9: Evidence Code section 801, subdivision (a) provides: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to

such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."

Nor do we agree with Robles that CSAAS evidence was unnecessary in this case because the jury questionnaires allegedly indicated none of the jurors had any preconceived notions about how victims of child sexual abuse should or should not act, as allegedly confirmed during voir dire. Rather, the jury questionnaires pertained to whether jurors were subject to challenge for cause, as correctly noted by the trial court. (See, e.g., Code Civ. Proc., §§ 225, 229.) And Robles identifies no requirement that admission of CSAAS evidence is conditioned on the People demonstrating that one or more jurors does or does not hold preconceived notions about child sexual abuse. As we have explained, CSAAS evidence is admissible to assist the jury in understanding an area outside of their common knowledge. (See *McAlpin, supra*, 53 Cal.3d at pp. 1299-1300.)

Finally, we reject Robles's contention that the admission of CSAAS evidence violated his rights to a fair trial and due process. Generally, a trial court's compliance with the rules of evidence does not violate a defendant's due process rights. (*People v. Hall* (1986) 41 Cal.3d 826, 834-835.) Because we have concluded there was no evidentiary error with respect to the court's decision to admit CSAAS evidence, we further conclude the admission of this evidence did not violate Robles's constitutional right to a fair trial or due process. (See *People v. Cage* (2015) 62 Cal.4th 256, 284 ["because the trial court did not abuse its discretion in admitting [the challenged evidence], there was no violation of defendant's constitutional rights"]; see also *People v. Lapenias* (2021) 67 Cal.App.5th 162, 174 [admission of CSAAS evidence did not violate due process]; *Patino, supra*, 26 Cal.App.4th at pp. 1744-1745 [same].)

*Robles*, 2019 WL 2082396, at *2-*3.

### 1.    Legal Standard

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir. 1986). The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Supreme Court precedent under § 2254(d)). Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. *See Henry*, 197 F.3d at 1031; *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991). The due process inquiry in federal habeas

13

review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *Colley*, 784 F.2d at 990. But the admission of evidence violates due process only if there are no permissible inferences that the jury may draw from the evidence. *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991).

### 2.    Analysis

The state court's denial of this claim on the merits did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Nor did the denial result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

The Ninth Circuit has held that CSAAS testimony is admissible in child sexual abuse trials "when the testimony concerns general characteristics of victims and is not used to opine that a specific child is telling the truth." *Brodit v. Cambra*, 350 F.3d 985, 991 (9th Cir. 2003). The record contradicts Petitioner's claim that the CSAAS testimony's sole purpose was to make the victim more credible. Rather, the CSAAS testimony was admitted to describe and explain a general characteristic of sexual assault victims: specifically, why sexual assault victims may have inconsistent memories or provide inconsistent testimony over time. The CSAAS testimony was relevant because, as the state appellate court observed, the victim had denied any sexual abuse during a school interview when younger, and because there were inconsistencies between the statements the victim made during the January 2016 recorded interview and at the November 2016 preliminary hearing. *Robles*, 2022 WL 278655, at \*9. And, in fact, the defense relied on these inconsistencies to challenge the victim's credibility. RT at 2456-65, 4012-14, 4018, 4024-25.

The state appellate court reasonably concluded that Dr. Carmichael's testimony was not prejudicial. While the prosecution's questioning elicited Dr. Carmichael's opinion regarding behavior by sexual assault victims similar to the behavior exhibited by the victim, Dr. Carmichael clearly informed the jury that he was not speaking about the victim. In addition, at the beginning and end of his direct examination, Dr. Carmichael emphasized that he had no knowledge regarding

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

the case, and that he was not there to tell the jury whom to believe.  RT 2730-31, 2760.

Furthermore, as the state appellate court noted, the trial court handled the admission of CSAAS evidence carefully and correctly.  The trial court admonished the jury immediately prior to Dr. Carmichael's testimony that his testimony should not be considered proof that the victim's testimony was true, and could be used, if used at all, only to weigh the inconsistencies in her testimony:

> So, members of the jury, evidence will be presented to you by Dr. Carmichael concerning child sexual abuse accommodation syndrome. This evidence is not received and must not be considered by you as proof that the alleged victim's claim is true. Child sexual abuse accommodation syndrome research is based upon an approach that is completely different from that which you must take to this case.
>
> The syndrome research begins with the assumption that a molestation has occurred and seeks to describe and explain common reactions of children to that experience. As distinguished from that research approach, you are to presume the defendant innocent.
>
> The People have the burden of proving guilt beyond a reasonable doubt. You should consider the evidence concerning the syndrome and its effect only for the limited purpose of showing, if it does, that the alleged victim's reactions, as demonstrated by the evidence, are not inconsistent with her having been molested.

RT 2732-33.   Juries are presumed to follow a court's limiting instructions with respect to the purposes for which evidence is admitted.  *Aguilar v. Alexander*, 125 F.3d 815, 820 (9th Cir. 1997). Petitioner has not offered any evidence to suggest that the jury did not follow the trial court's limiting instructions.  Finally, a jury could have reasonably found the victim credible despite the inconsistencies in her testimony as she provided consistent testimony regarding numerous incidents of sexual abuse over a ten-year period, part of which was corroborated by the testimony of her grandmother and her sister.

Federal habeas relief is denied on this claim.

C.   **Certificate of Appealability**

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  *See* Rules Governing § 2254 Case, Rule 11(a).  A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.

*Id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, Petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## CONCLUSION

For the reasons stated above, the Court orders as follows.

1.     In accordance with Habeas Rule 2(a) and Rule 25(d)(1) of the Federal Rules of Civil Procedure, the Clerk of the Court is directed to substitute Warden Christopher Pierce as respondent because he is Petitioner's current custodian.

2.     The Court DENIES the petition for a writ of habeas corpus, and DENIES a certificate of appealability.

3.     Judgment is entered in favor of Respondent and against Petitioner. The Clerk shall close the file.

**IT IS SO ORDERED.**

Dated:  June 11, 2026

_____
JON S. TIGAR
United States District Judge

United States District Court
Northern District of California

16